MR. JUSTICE GROVES
delivered the opinion of the Court.
His Excellency, Richard D. Lamm, Governor of the State of Colorado, addressed three interrogatories to this court pursuant to Colorado Constitution Article VI, Section 3. These relate to nine bills which were enacted by the first regular session of the Fifty-First General Assembly of Colorado.[1] The interrogatories read:
“1. Were S.B. 115, S.B. 575, S.B. 580, S.B. 582, H.B. 1121, H.B. 1381, H.B.1535, H. B. 1589 and H.B. 1646 duly enacted by the fifty-first General Assembly when the Senate failed to take a vote by ayes and noes of the Senators then present in the chamber upon concurrence in a House amendment and/or upon adoption of the report of a committee of conference and/or upon final passage, as more particularly shown for each bill by the attached stipulation of facts and accompanying exhibits?
“2. Were the bills enumerated in question No. 1 (except S.B. 580) vetoed by Governor Lamm and were the twenty-four bills referred to in the attached stipulation of facts vetoed by Governors Love and McNichols, given that in each such case the following procedure occurred:
“(1) each bill was presented to the Governor and the General Assembly by its adjournment prevented return of the bill to it within ten days, and
“(2) each bill was disapproved by the Governor within thirty days after adjournment and was filed with the office of the Secretary of State more than thirty days after adjournment?
“3. Was S.B. 580 vetoed by the Governor when it was presented to the Governor and partially disapproved within ten days thereafter, not returned to the General Assembly prior to adjournment, and filed with the office of the Secretary of State after adjournment?”
*201 A Stipulation of Facts executed by the Governor and by Senator Ralph A. Cole, acting for The Committee on Legal Services of the General Assembly, was filed with the interrogatories.
S.B. 580 will be discussed separately later in this opinion. Of the remaining eight bills, following action thereon by the General Assembly, one was delivered to the Governor on June 15, 1977, a second on June 16, 1977 and the other six on June 20, 1977. This session of the General Assembly adjourned sine die on June 22, 1977. The Governor did not return any of the bills to either house of the General Assembly. The Governor vetoed seven of the bills on July 15, 1977 and made a public announcement of his vetoes thereof on July 18, 1977. He vetoed the eighth bill on July 19, 1977 and on the same day made a public announcement of that fact. On July 27, 1977 he delivered each of the eight bills to the Secretary of State and on August 2 and 9, 1977 he delivered his veto letters, viz., his statement of objections to the bills, to the Secretary of State.
It thus appears that: prior to the taking of any formal action by the Governor as to the eight bills, the General Assembly adjourned sine die; this adjournment was less than ten days from the time the bills were presented to the Governor; within 30 days after such adjournment the Governor vetoed the bills and made public announcement thereof; and the Governor did not file the bills with his objections in the office of the Secretary of State within 30 days of the adjournment.
The Colorado Constitution, Article IV, Section 11 provides:
“Every bill passed by the general assembly shall, before it becomes a law, be presented to the governor. If he approve, he shall sign it, and thereupon it shall become a law; but if he do not approve, he shall return it, with his objections, to the house in which it originated, which house shall enter the objections at large upon its journal, and proceed to reconsider the bill. If then two-thirds of the members elected agree to, pass the same, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members elected to that house, it shall become a law, notwithstanding the objections of the governor. In all such cases the vote of each house shall be determined by ayes and noes, to be entered upon the journal. If any bill shall not be returned by the governor within ten days after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the general assembly shall by their adjournment prevent its return, in which case it shall be filed with his objections in the office of the secretary of state, within thirty days after such adjournment, or else become a law.”
In his first interrogatory, the Governor has inquired as to whether the nine bills were duly enacted by the General Assembly; and in that connection the Attorney General has argued on behalf of the Governor that they were not duly enacted. We conclude that they were duly enacted, but the *202 discussion of this question will be found later in this opinion.
I.
We first address ourselves to the first question submitted in the Governor’s second interrogatory, namely, Were the purported vetoes of the eight bills valid? Our answer is in the negative. Without the required filing of the bills and objections with the Secretary of State within the 30-day period following adjournment, the Governor’s actions had no effect and the bills became law.
The argument submitted on behalf of the Governor is to the following effect:
“The United States Constitution permits the President to exercise a ‘pocket veto’ as to bills presented to him within ten days prior to adjournment of the Congress. U.S. Const. Art. I, §7(2). During the days of the Territory of Colorado, the territorial governor had a similar power of ‘pocket veto’ as to bills presented to him by the legislative assembly of the territory. 12 U.S. Stat. at L., p. 700. When our Colorado Constitution was adopted its provisions (above quoted) abolished the ‘pocket veto’, by which through the executive’s inaction bills fail to become law without any explanation by the executive.
“It follows, that the reason in the Colorado Constitution for the 30-day filing with the Secretary of State of the vetoed bill and the objections thereto is to make the Governor publicly accountable by giving to the people a statement of the reason for his disapproval of the bill. ‘The essence of the post-adjournment veto power then is gubernatorial action plus public announcement thereof.’ If the Governor within 30 days following adjournment makes a public announcement of his objections to a bill which he has vetoed, the only remaining purpose of the ‘provision requiring filing of a disapproved bill in the office of the secretary of state is to memorialize the evidence of the governor’s.actions.’ Under the circumstances here, the filings more than 30 days after adjournment should not render the disapprovals invalid. There was substantial compliance with the constitutional requirements.”
We do not agree with the second paragraph of the foregoing paraphrased argument.
A similar constitutional provision was under consideration in Capito v. Topping, 65 W. Va. 587, 64 S.E. 845 (1909). We quote a portion of that opinion, written for a unanimous court by Judge Poffenbarger:
“Constitutional provisions are organic. They are adopted with the highest degree of solemnity. They are intended to remain unalterable except by the great body of the people, and are incapable of alteration without great trouble and expense. They are the framework of the state as a civil institution, giving cast and color to all its legislation, jurisprudence, institutions and social and commercial life, by confining the legislature, the executive and judiciary within prescribed limits. All the great potential, dominating, *203 creative, destroying and guiding forces of the state are brought within their control so far as they apply. Thus, to the extent of their duration, they define and limit the policy of the state more rigidly and unalterably than the sails and rudder of the ship, when set, govern and control its course. . . . We are aware of no decision authorizing the view that a constitutional clause, dealing with matters so high and vital in character as the executive power of veto, and the making of laws, and having form and terms so emphatic, is merely directory.”
We realize that at times constitutions must be interpreted in the light of changing times and circumstances. Nevertheless, under the circumstances of this case, the views of Judge Poffenbarger are applicable. Our constitutional provision is perfectly plain and emphatic. It states that, if the adjournment of the General Assembly prevents the return of the bill, “it shall be filed [by the Governor] with his objections in the office of the secretary of state,within thirty days after such adjournment or else become a law.” (emphasis added).
The Attorney General argues rather persuasively that the purpose of the constitutional provisions has been accomplished by the public announcements of the vetoes and the reasons therefor. Here the mandatory constitutional language leaves no room for the type of functional interpretation sought by the Governor. See Croissant v. DeSoto Improvement Co., 87 Fla. 530, 101 So. 37 (1924); In re Opinion to the Governor, 44 R.I. 275, 117 A. 97 (1922); State v. Junkin, 79 Neb. 532, 113 N.W. 256 (1907); and State v. Norton, 21 N.D. 473, 131 N.W. 257 (1911).
II.
The stipulation contains a statement to the effect that from 1957 to 1976 preceding governors of this state filed 24 vetoed bills with the Secretary of State more than 30 days after adjournment of the General Assembly. The remaining portion of the Governor’s second interrogatory inquires as to the validity of these vetoes.
Under Colorado Constitution Article VI, Section 3, we may give our opinion upon inquiry of the Governor “upon important questions upon solemn occasions.” It has not been demonstrated to us that the validity of these vetoes during the past 20 years involves important questions upon solemn occasions. We are given no clue as to what bills were vetoed. We have not been advised as to whether they were published in the Session Laws of Colorado, the codifications of our laws, or the supplements thereto. The statutes contained in C.R.S. 1963 and C.R.S. 1973, respectively, were reenacted by the General Assembly. Each year the General Assembly has reenacted the statutes contained in the cumulative supplements to the decennial codifications. The General Assembly has yet to act as to the contents of the 1977 cumulative supplement to C.R.S. 1973, and our answers to interrogatories probably will govern its actions as to the inclusion of bills presented by the First Regular Session of the Fifty-First *204 General Assembly. No such consideration can be involved as to preceding sessions.
III.
The third interrogatory of the Governor is, in effect, whether his purported veto of S.B. 580 was valid. We answer in the negative and rule that S.B. 580, in its entirety, became law on the expiration of ten days from the time it was presented to him.
S.B.580 was a supplemental appropriation to the Department of Revenue. It was enacted by the General Assembly and delivered to the Governor on June 10, 1977. It was then “partially vetoed by notation and signature on June 20, 1977.” It was not returned to the Senate, the house of origin, but was filed with the Secretary of State on August 2, 1977.
Vetoes of appropriation bills are treated by Colo. Const.Art. IV, §12, which provides:
“The governor shall have power to disapprove of any item or items of any bill making appropriations of money, embracing distinct items, and the part or parts of the bill approved shall be law, and the item or items disapproved shall be void, unless enacted in manner following: If the general assembly be in session, he shall transmit to the house in which the bill originated a copy of the item or items thereof disapproved, together with his objections thereto, and the items objected to shall be separately reconsidered, and each item shall then take the same course as is prescribed for the passage of bills over the executive veto.”
It is to be observed that §12 contains no time limitations within which the Governor must exercise his veto power. Since the preceding §11, already quoted, applies to “Every bill passed by the general assembly,” §12 must be read in conjunction with §11 as to time limitations. See Dickinson v. Page, 120 Ark. 377, 179 S.W. 1004 (1915). See also Wheeler v. Gallet, 43 Idaho 175, 249 P. 1067 (1926); Wood v. State Administrative Board, 255 Mich. 220, 238 N.W. 16 (1931); Mills v. Porter, 69 Mont. 325, 222 P. 428 (1924); State v. Forsyth, 21 Wyo. 359, 133 P. 521 (1913).
The 10-day limitation in §11 applies to the Governor’s attempted veto of S.B. 580. He did not follow the constitutional mandate that “he shall return it with his objections, to the house in which it originated . . . within ten days after it shall have been presented to him.” The same reasoning which we have applied to the eight attempted post-adjournment vetoes applies with equal force to this attempted pre-adjournment veto of S.B. 580. Since it was not returned to the Senate with his objections within ten days after it had been presented to him, it then became law.
Before passing to the next subject, we mention that neither in the stipulation nor in anything else before us does it appear that the Governor made a public announcement of his partial vetoes of S.B. 580.
*205 IV.
The effect of the Governor’s first interrogatory is to inquire whether, by reason of Senate action — or inaction — all nine bills mentioned earlier in this opinion were duly enacted.
The Colorado Constitution, Article V, Section 22 and 23 provides:
“Section 22. Reading and passage of bills. Every bill shall be read by title when introduced, and at length on two different days in each house; provided, however, any reading at length may be dispensed with upon unanimous consent of the members present. All substantial amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill, and no bill shall become a law except by a vote of the majority of all members elected to each house taken on two separate days in each house, nor unless upon its final passage the vote be taken by ayes and noes and the names of those voting be entered on the journal.”
“Section 23. Vote on amendments and report of committee. No amendment to any bill by one house shall be concurred in by the other nor shall the report of any committee of conference be adopted in either house except by a vote of a majority of the members elected thereto, taken by ayes and noes, and the names of those voting recorded upon the journal thereof.”
The contention is submitted on behalf of the Governor that these bills were not duly enacted as there was not a vote as to each “taken by ayes and noes.”
Under the provisions of the stipulation, there was submitted to us the Senate Journal of the First Regular Session of the Fifty-First General Assembly and certain tape recordings of certain action taken by the Senate in connection with the nine bills mentioned earlier in this opinion.
The contention of the Governor is predicated upon the apparent showing by the tape recordings that a “present roll call” or a “previous roll call” was used in connection with votes upon final reading, concurrence in a House amendment, adoption of a conference committee report, and passage of a bill as amended.
The definitions of “present roll call” and “previous roll call” are contained in the Attorney General’s brief as follows:
“In Senate practice, the phrase ‘present roll call’ refers to the morning ‘present/absent’ roll call of the Senators with the addition of all Senators who have appeared in the chamber subsequent to the morning roll call but without deletions for any Senators who have left the chamber. When the Senate adopts by reference a ‘present roll call’, the practice is to equate ‘present’ with ‘aye’ and ‘absent’ with ‘no’. When the Senate adopts by reference a ‘previous roll call’, the practice refers to a prior ‘present roll call’ or some other ‘roll call’ occurring earlier in the same day.”
The following is taken from the brief of the General Assembly’s Committee on Legal Services:
*206 “The method of voting employed with regard to the bills in question on the various occasions for voting as set forth in the Stipulation of Facts can be briefly described as follows:
1. A member of the Senate moves the passage of a bill upon final reading or concurrence in a house amendment, or adoption of a conference committee report, or passage of a bill as amended;
2. Either the moving Senator or the presiding officer of the Senate then suggests that the previous roll call be adopted or utilized as the roll call on the matter before the Senate;
3. The presiding officer of the Senate then asks if there are any objections to the use of the previous roll call;
4. Upon the question of whether there is an objection to the use of the previous roll call, members of the Senate are provided with the opportunity to either demand a roll call or request that their vote on the previous roll call be changed.
“Counsel for the Committee on Legal Services of the General Assembly urge that this manner of voting constitutes a vote taken by ayes and noes within the meaning of the Colorado Constitution. Admittedly, the roll of the Senate is not called with each Senator verbally responding ‘aye’ or ‘no’. Every Senator is, however, given full and ample opportunity to make it clear that he is voting for or against a given matter.”
We turn now to the Attorney General’s brief:
“The recorded votes on S.B. 115 are representative of the Senate’s interpretation of the aye and no vote requirement. Tape No. M2T-77-12A, beginning at time 9:10:13, records the proceedings in the Senate on the third reading (i.e., final passage) of S.B. 115. The presiding officer put the question to the Senate, asked the body if there were any objections to the use of the ‘previous roll call’ and, hearing none, declared that the result of the vote on third reading of S.B. 115 would be the same as the ‘previous roll call.’ In another instance, when the Senate adopted the conference committee report on S.B. 115, the calling of the roll was accomplished when the presiding officer put the question, asked the body if there were any objections to the use of the ‘present roll call’ and, hearing several objections, announced the results as being that of the ‘present roll call’, with certain modifications reflecting those Senators objecting.”
The entries in the Senate Journal as to action on S.B. 115 on June 3, 1977 appear as follows:
5. B. 115 by Sen. Don Sandoval — State Employee Grievances
Senator Schieffelin moved for the adoption of the First Conference Committee Report on S.B. No. 115 (printed in Senate Journal, May 17, page 1809-1810).
The motion was declared adopted by the following roll call vote:
*207 [[Image here]]
The foregoing is representative of the entries in the Senate Journal of votes on final passage, upon adoption of conference committee reports and upon concurrence in House amendments.
The stipulation states: “The parties do not stipulate as to the legal effect of the Senate Journal and the tape recordings.”
From the presentations made to us we conclude that the nine bills were duly enacted. Our reasons follow:
A. The journals, unlike the tape recordings, are the constitutionally prescribed records of the Senate. Colorado Constitution, Article V, Section 13 provides:
“Each house shall keep a journal of its proceedings and publish the same, except such parts as require secrecy, and the ayes and noes on any question shall, at the desire of any two members, be entered on the journal.”
B. Neither the Colorado Constitution nor the statutes of Colorado contain any reference to or authorization for tape recordings. No *208 provision is made in the rules of either the House or of the Senate concerning the use of tapes as journals. Rule No. 28 of the Joint Rules of the Senate and House of Representatives of the State of Colorado is the only reference to the tapes to be found in the rules of the General Assembly. This rule provides:
“The magnetic tapes of any meeting held in the capítol building of the General Assembly or either house thereof, whether created by statute, by resolution, or rule of either house, or by joint resolution or joint rule of the General Assembly, shall be recorded and stored in accordance with the following policies and procedures:
(1) Two identical tapes are to be made initially.
(2) One tape is to be transferred to the State Archivist as soon as practicable after it is removed from the recorder. A duplicate copy of the tape shall be transferred to the Legislative Information Center of the General Assembly.
(3) The State Archivist shall store and maintain the tapes delivered to him.
(4) The tapes delivered to the Legislative Information Center shall be kept therein until the beginning of the next regular session of the General Assembly.
(5) All tapes shall be available for use by the public during the regular office hours of the Division of State Archives and Public Records and the Legislative Information Center.
(6) The Director of Research of the Legislative Council shall be, and is herein designated as, the official custodian of all of the tapes.”
There is nothing in this joint rule which purports to give authority, even if such authority could be given, for the tapes to be used in impeachment of the journals. The Senate Journal here involved was properly certified and, as already mentioned, constitutionally authorized. The tapes not only are not certified, but we know of no provisions providing for any certification. In sum, we do not find sufficient basis for use of the tapes in attempted impeachment of the journal entries here involved. See People v. Leddy, 53 Colo. 109, 123 P. 824 (1912); Andrews v. People, 33 Colo. 193, 79 P. 1031 (1905); Hughes v. Felton, 11 Colo. 489, 19 P. 444 (1888).
C. Further, we are not prepared to hold that, even if the votes were taken as proportedly disclosed by the tape recordings, this is not in compliance with Colorado Constitution, Article V, §§22 and 23. In other words, on the basis of the presentation to us, there would appear to be compliance with the two last-mentioned sections of the constitution.
The real problem with the “ayes and noes” requirement is that it is inherently ambiguous. The constitutional section does not specify in exactly what manner the ayes and noes are to be taken — whether by roll call requiring a verbal response, by standing, by a hand signal, by a tally on an electric scoreboard, or by any other specific method. There are un *209 doubtedly many ways of taking an ayes and noes vote and no particular one is constitutionally mandated.
If the Colorado Constitution required a particular manner of taking the ayes and noes, then the legislature would be required to strictly comply with that procedure. Just as we hold the Governor to literal compliance with the specific procedures and time limitations for exercise of his veto power, so should we hold the General Assembly to compliance with specific constitutional provisions regulating its procedure. However, when the constitutional requirement can be complied with in a number of ways, our task is to determine whether the method actually chosen is in conformity. The critical inquiry is whether, during final passage, the members of the legislative body were afforded the opportunity to approve or disapprove the pending bill and whether this individual approval or disapproval was recorded in the official journal as mandated by the constitution. Here, the method of voting by the Senate — by use of the “present roll call” and “previous roll call” — in adopting the bills under consideration, afforded the members the opportunity of approval or disapproval.
While we do not necessarily concur, it has been urged, with the citation of a number of cases as authority, that we should hold that the recitals in the journal are conclusive and may not be contradicted or altered in any manner. Under the situation here presented we should show deference to a long standing practice of Senate action in the adoption of bills. We quote the philosophy of this court expressed over 70 years ago in Board of County Commissioners of Pueblo County v. Strait, 36 Colo. 137, 85 P. 178 (1906):
“ ... we should show great deference to the legislative construction of the constitution, particularly with reference to its construction of the procedure provided by the constitution for the passage of bills.
“We are not without serious doubts as to the correctness of the legislative practice, and we are not prepared to say that unaided by the legislative construction of the articles of the constitution, our construction would have been the same; but it is our duty to resolve the doubt in favor of the validity of the act.”
To summarize, the nine bills here involved became law. It should be noted that we do not in any manner pass upon the constitutionality of any of these bills.
MR. JUSTICE ERICKSON concurs in part and dissents in part.
MR. CHIEF JUSTICE PRINGLE and MR. JUSTICE CARRIGAN dissent.

 This session convened on January 5, 1977 and adjourned sine die on June 22, 1977.